Philip E. Ludwig v. Commissioner. Joseph J. Day v. Commissioner. Frances D. Kirnan v. Commissioner.
Ludwig v. Commissioner
Docket Nos. 42193-42195.
United States Tax Court
T.C. Memo 1954-41; 1954 Tax Ct. Memo LEXIS 203; 13 T.C.M. (CCH) 471; T.C.M. (RIA) 54147; May 17, 1954, Filed *203 The amount paid by petitioners to the Office of Price Administration in settlement of claimed overcharges is deductible as an ordinary and necessary business expense where petitioners had no intention of violating the regulations and acted on advice of counsel. Harry J. Winick, Esq., for the petitioners. William G. O'Neill, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income taxes for the calendar year 1945 as follows: Docket
Petitioner
No.
Amount
Philip E. Ludwig
42193
$ 798.40
Joseph J. Day
42194
1,742.17
Frances D. Kiernan
42195
1,598.33
Each of the petitioners alleges that respondent erred in the disallowance of a deduction of $8.42 claimed as an unincorporated business tax paid to the State of New York by the partnership. Since no proof was offered at trial as to this issue, it is deemed abandoned and respondent's disallowance is affirmed. The sole issue remaining for decision is whether respondent correctly disallowed, in the computation of partnership income, the deduction of a payment of $9,852.81 to the Office of Price Administration in settlement *204 of claimed overcharges in violation of ceiling price regulations. Some of the facts were stipulated and they are incorporated herein by this reference. Findings of Fact Petitioners, Philip E. Ludwig, Joseph J. Day and Frances D. Kiernan, are residents of Queens Village, New York City, and Brooklyn, New York, respectively. Each of them filed a timely return for 1945 with the collector of internal revenue for the second district of New York. J. E. Carret & Company, hereinafter referred to as the partnership, was organized on or about January 1, 1942. It was primarily engaged as a distributor of green coffee, its principal place of business being in New York City. From January 1, 1945 to February 13, 1945, William C. Kiernan (the husband of petitioner Frances D. Kiernan) and petitioner Day each held a 37 1/2 per cent interest in the partnership, and petitioner Ludwig held the remaining 25 per cent. After the death of William C. Kiernan on February 13, 1945, the partnership continued in business with the Estate of William C. Kiernan, Frances D. Kiernan, [1] executrix, succeeding to Kiernan's 37 1/2 per cent interest for the balance of the calendar year. *205 Under the administration of the estate, all the income of the estate from the partnership operations during 1945 was paid to petitioner Frances D. Kiernan during that year. Throughout the year 1944, the partners experienced difficulty in obtaining a sufficient supply of certain types of coffee to satisfy the demands of their customers. The shortages were largely caused by the limited availability of merchant ships in wartime, and the frequent attacks on merchant shipping by German submarines. The Office of Price Administration, hereinafter referred to as O.P.A., issued as a part of its regulations "Part 1351 - Foods and Food Products, Revised Price Schedule No. 50 - Green Coffee", effective December 11, 1941, wherein the various types of green coffee were assigned definite ceiling prices. The ceiling prices imposed by O.P.A. sometimes worked a hardship on the partnership since in many instances the persons from whom the partners bought were not subject to price control regulations. The prices paid by the partnership frequently equalled or exceeded the established ceiling price for resale of that type of coffee. An amendment to the regulations dated July 18, 1942, provided: *206 "Any person making sales of green coffee in lots of 25 bags or less may add to the maximum prices specified above an amount not in excess of 3% of the comparable selling price of lots of more than 25 bags * * *." Shortly after the amendment of July 18, 1942, the partners contacted Arthur B. Colwin, an attorney at law and counsel for the Green Coffee Association, and requested an interpretation of that amendment. Colwin advised them that in his opinion no violation of the regulations would result from their refusing to sell more than 25 bags from a given lot to a customer on any one day and applying the 3 per cent increase to all 25 bag sales. He cautioned them, however, that any agreement or understanding between the seller and a buyer of normally large quantities to split such purchases into a number of 25 bag sales would be an evasion and violation of the regulations. The partners followed the advice of counsel in making sales of coffee in 25 bag lots. At no time did they make more than one sale of 25 bags or less to a customer from the same lot on the same day. They sometimes refused to sell more than 25 bags from a lot to a customer who asked for a larger quantity. If that *207 customer requested more of the same type of coffee on the following day, the partners sometimes sold him another 25 bags or more, depending on its availability, but in no case did they offer any assurance that more coffee from the same lot would be available at any future time. Petitioners never entered into any agreements or understandings with its customers that normally large purchases would be broken down into a number of smaller purchases. In the latter part of 1944, the New York enforcement division of O.P.A. requested that the partnership produce its books and records for examination. At the request of the Green Coffee Association, Colwin and the president of that association met with representatives of O.P.A. to discuss the proper interpretation of the amendment dealing with 25 bag sales. Other conferences followed and it was finally agreed that Colwin and an attorney designated by O.P.A. would go over the records of the members of the association with emphasis on those instances where a number of 25 bag sales had been made to the same customer. The records of J. E. Carret & Company, covering sales between December 15, 1943 and August 31, 1944, were so examined. During *208 that period, 17,454 bags of coffee of several types were sold in lots of 25 bags or less. Of that number, 7,832 bags were sold as follows: 1. To small roasters who invariably purchased in small quantities from all their suppliers; or 2. To somewhat larger roasters who nevertheless bought from the partnership only in small quantities; or 3. To larger roasters to whom the partners regularly made substantial sales, but under such circumstances that the particular sales would have been made in small quantities even if there had been no price controls. As a result of the discussions between Colwin and the O.P.A. attorney, it was agreed that the partnership would pay the sum of $9,852.81 to O.P.A. in full settlement of all matters arising from multiple sales of 25 bags or less. The parties disregarded the sales of the aforementioned 7,832 bags in arriving at the figure of $9,852.81 which was computed by taking 150 per cent of the alleged overcharges on the remaining 9,622 bags sold in lots of 25 or less during the period December 15, 1943 to August 31, 1944. [2] O.P.A. representatives stated to the partners that they would be unwilling to accept the partnership's explanation of those *209 sales without further verification through an inspection of the books of the partnership's customers. The partners decided, for purposes of settlement, not to attempt to prove their contentions that the multiple sales of 25 bags or less aggregating 9,622 bags, on which the settlement was based, were made in full compliance with the regulations. One of the principal factors which prompted the partners in taking this course was their fear that an extensive investigation including an O.P.A. audit of the records of their customers would result in inconvenience and annoyance to those customers with consequent injury to the good will of the partnership. Although no written agreement was executed, the partnership paid the agreed sum of $9,852.81 to O.P.A. in January, 1945. An affidavit prepared by Colwin and executed by petitioner Day on behalf of the partnership was filed with O.P.A. at the time of payment. J. E. Carret & Company was not a defendant in any action brought by O.P.A., nor was any action commenced at any time by O.P.A. against the partners. *210 At no time did the partnership concede that it had violated the price controls, either intentionally or unintentionally. J. E. Carret & Company relied solely on the advice of its attorney, Colwin, with respect to all matters concerning price control. The partners took every practical precaution and used proper diligence and care in an effort to comply with the Emergency Price Control Act of 1942, as amended, and the regulations issued pursuant thereto. Insofar as the partners violated the amendment as to sales in lots of 25 bags or less, they did so innocently and unintentionally. Opinion ARUNDELL, Judge: This case presents the now familiar question of deductibility of payments to O.P.A. in settlement of alleged violations of wartime ceiling price regulations. Respondent asserts, initially, that all such payments are non-deductible, a position he has consistenly taken in cases of this nature. He concedes, however, that the Courts have generally rejected this view, basing their decisions rather on the intentions and actions of the individual taxpayers in making the sales giving rise to the alleged overcharges. Where the overcharges are made innocently and unintentionally and not *211 through unreasonable lack of care, the payments to O.P.A. are deductible or ordinary and necessary business expenses within the meaning of section 23(a)(1)(A) of the ; , affd. (C.A. 6) . The question is one of fact. Respondent's argument, therefore, is directed primarily to an atempt to show that the partners in J. E. Carret & Company intentionally violated the ceiling price regulation in question and he asks for a finding to that effect. We think that such a finding is precluded by the reliance of the partners on the advice of counsel throughout the period of regulated prices. The evidence shows that while the partnership was restricted as to the selling price of coffee, there was no control over the amount it had to pay. The resultant squeeze on the partnership would not, of course, justify a violation of the regulations, but the partners naturally sought by every lawful means to escape from this economic dilemma. In so doing, they sought the advice of counsel immediately after the issuance of the amendment in question and were advised *212 that by selling in lots of 25 bags or less, they could increase prices on those sales by three per cent so long as no agreement was entered into with the purchaser to the effect that large sales would be split so as to obtain a greater aggregate price. We have found as a fact that no collusive agreements were ever entered into by the partners and that they invariably followed the advice of their counsel. As to the sale of the 9,622 bags on which the settlement was based, the partners decided not to press their contentions when it became apparent that the justification of those sales would require an examination of the books of the customers of the partnership with resulting annoyance to them and possible injury to the good will of the partnership. It is our opinion, after reviewing all of the evidence, that to the extent that the partners violated the regulation in question, they did so innocently and unintentionally, and that they used reasonable care in attempting to comply with those regulations. It follows that the payment made to O.P.A. was an ordinary and necessary expense of the business and that the deficiencies must be set aside insofor as they are based on disallowance *213 of deductions for that expense. Decisions will be entered under Rule 50. Footnotes
1. For convenience, Frances D. Kiernan will be referred to as one of the partners.↩
2. From September 1, 1944 to the end of that year, there were no multiple sales of 25 bags or less to any customer from the same lot.↩